UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MADELENE YAHYA,

               Plaintiff,                           Civil Action No. 13-12054

           v.                               District Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.

_____/

**OPINION AND ORDER GRANTING IN PART**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [8] AND**
**DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [10]**

      Madelene Yahya was working as a public bus driver when she slipped on ice in the parking lot and injured her knee. Unable to return to work, she was awarded workers' compensation and filed an application for disability insurance benefits. While her application was pending, Yahya's impairments were compounded by an automobile accident. The Commissioner of Social Security denied her application, leading to this appeal. Yahya and the Commissioner have now filed cross-motions for summary judgment (Dkts. 8, 10). For the reasons set forth below, the Court finds that the Social Security Administration's Administrative Law Judge erred by failing to obtain a medical expert opinion on medical equivalence. The Court therefore GRANTS IN PART Yahya's Motion for Summary Judgment (Dkt. 8), DENIES the Commissioner's Motion for Summary Judgment (Dkt. 10), and, pursuant to 42 U.S.C. § 405(g), REMANDS for the Commissioner to obtain a medical expert opinion on medical equivalence.

1

## I. BACKGROUND

### A. Procedural History

On June 8, 2009, Yahya protectively filed for disability insurance benefits asserting that she became unable to work on January 25, 2008, at the age of 47. (*See* Tr. 66, 115.)[1] The Commissioner initially denied her disability application on October 8, 2009. (Tr. 66.) Yahya then requested an administrative hearing, and on June 22, 2011, she appeared with counsel before Administrative Law Judge James F. Prothro, who considered her case *de novo*. (Tr. 34–65.) In an August 10, 2011 decision, ALJ Prothro found that Yahya was not disabled within the meaning of the Social Security Act. (*See* Tr. 20–30.) The ALJ's decision became the final decision of the Commissioner on March 8, 2013, when the Social Security Administration's Appeals Council denied Yahya's request for review. (Tr. 1.) Yahya filed this suit on May 9, 2013. (Dkt. 1, Compl.)

### B. Testimony at the Administrative Hearing

At the administrative hearing before ALJ Prothro, Yahya testified that she was employed as a public bus driver in January 2008 when she slipped on ice in the parking lot at work and injured her knee. (Tr. 42, 46–48.) As a result of the knee injury, as well as arthritis in her hip and spine, Yahya said she was unable to return to work. (Tr. 48.) She also testified that she was in an automobile accident in September 2010. (Tr. 46.)

Yahya said her sleep was disrupted by pain every night, and most of the time her medications did not help. (Tr. 48, 51–52.) She said her doctor told her she needed hip replacement but that she should wait until she was closer to 60. (Tr. 51.) Yahya said she was taking Vicodin and Motrin, and received shots at a pain clinic. (Tr. 50, 52.) She said she took Motrin two to three times a day and Vicodin at least once or twice a week. (Tr. 59.) She was given exercises to do at home for

---

[1] The transcript of administrative proceedings filed by the Commissioner (Dkt. 6) is cited as "Tr."

her neck and knee. (Tr. 57–58.) And she was referred to a rheumatologist, but could not afford it because she did not have insurance at the time. (Tr. 56.)

In addition, Yahya testified that she had depression and anxiety, which caused panic, rapid heartbeat, and memory and sleep problems. (Tr. 49, 53.)

Yahya testified that she lived with three of her six children, ages 15, 13, and 11. (Tr. 39.) She also provided childcare for family members in 2010, before her automobile accident. (Tr. 44; *see* Tr. 444.) Yahya said her kids helped her with "just about everything," including cooking and grocery shopping. (Tr. 53.) She said she was able to make her bed and do a few dishes. (Tr. 53–54.) Before February 2011, she was paying her mother to help her with chores. (Tr. 54.)

Yahya said she napped for 30 minutes to an hour several times a day. (Tr. 54.) She said she spends a lot of time in bed because she cannot sit up for a long period of time due to pain in her hip, spine, and lower back. (Tr. 55.) She testified that she drove her children to their extracurricular activities, but she waited outside in the car for them because going in to watch involved "[t]oo much walking." (Tr. 55.)

Yahya was 51 years old at the time of the hearing, and said she had one year of college education. (Tr. 39.)

After Yahya testified, the ALJ questioned a vocational expert ("VE") about job availability for a hypothetical individual of Yahya's age, education, and work experience who was limited to light exertional work (lifting up to 20 pounds occasionally and 10 pounds frequently, and standing or walking up to four hours and sitting up to six hours in an eight-hour period); could "do simple repetitive work or unskilled work and with no work with the general public"; could not climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs; and could occasionally stoop, kneel, crouch, and crawl. (Tr. 60.) The VE testified that such an individual could not

perform Yahya's past relevant work, but could "do various types of assembly positions," "machine operation and tending positions," and "visual inspection and sorting positions." (Tr. 60.) The VE said "in the regional economy currently" there were about 18,000, 7,000, and 5,000 such positions, respectively. (Tr. 60–61.) The VE testified such an individual could also perform jobs at the sedentary exertional level: about 15,000 "other assembly positions," about 3,500 "other machine tending positions," and about 3,500 "other inspection and sorting positions." (Tr. 61.)

The ALJ also asked the VE about job availability for a hypothetical individual of Yahya's age, education, and work experience with the same limitations as above, but who also "must avoid overhead reaching and any work overhead due to a problem with the cervical spine." (Tr. 61.) The VE testified that there would be no difference in the available jobs because overhead work and overhead reaching was "not a primary, secondary, or even tertiary function of any of these jobs." (*Id.*)

During questioning by Yahya's attorney, the VE testified that no more than one absence per month is typically tolerated in the jobs he identified. (Tr. 62.) He also said "[g]enerally speaking," it would be work-preclusive "[i]f a person needed to be recumbent or napping and this occurred daily and it occurred to a point where it was beyond the typically allowed breaks and lunch periods." (Tr. 62.) And he agreed it would be work-preclusive "if someone's concentration was deficient let's say 20 percent of the time to a point where one day a week they were non-productive because they were off task." (Tr. 62–63.)

### C. Medical Records

#### *1. Knee Injury*

Yahya sought emergency treatment for pain in her left knee on January 25, 2008, after she tripped, slipped on ice, and landed on her knee, according to the emergency room report. (*See* Tr.

4

312.) Examination revealed no swelling, bruising, or deformity, and no motor or sensory deficits. (*Id.*) X-rays were negative for fracture, dislocation, or other bone or joint abnormality. (*Id.*) Yahya was discharged with crutches and a knee brace and "a work excuse for nonweightbearing until cleared by her primary care doctor." (*Id.*)

Yahya's primary care doctor was Scott A. Johnson, D.O. (*See* Tr. 222.) The record contains notes of Dr. Johnson's examinations of Yahya on seventeen occasions between November 2007 and January 2011. (*See* Tr. 234–309, 390–432.) Two of those concerned Yahya's knee pain. On February 21, 2008, Yahya followed up with Dr. Johnson at the direction of the emergency room doctors who treated her left knee injury in January. (*See* Tr. 240.) Dr. Johnson's notes indicated that Yahya "[a]lready has seen orthopedist and mri done and pt reports that it revealed a medial collateral ligament ["MCL"] strain," (Tr. 241) but there are no corroborating records from the orthopedist. On examination, Dr. Johnson found "some effusion and medial joint line pain." (Tr. 241.) He prescribed Vicodin and recommended that she follow up with workers' compensation. (Tr. 241–242.) He wrote a "To Whom It May Concern" letter stating that "Yahya may not work until re-evaluated by orthopedic specialist because of persistent knee pain and swelling." (Tr. 393.)

A week later, on February 27, orthopedist Peter C. Theut, M.D., saw Yahya for a follow-up regarding her knee. (Tr. 327.) His examination notes were copied to Workers' Compensation. (*Id.*) He reported: "On exam, it is difficult to examine her knee. She is apparently in a great deal of discomfort. Objectively, the only real finding that I can see is that with some gentle valgus stress I believe she has some discomfort over the proximal aspect of the MCL." (*Id.*) He also noted "some tenderness at the quads" and "some weakness with extension," but "no real swelling" and "no motor or sensory deficit." (*Id.*) He reviewed her MRI and said it showed "a low grade MCL

sprain" with "some thickening of both the quadriceps insertion and the origin of the patellar tendon, consistent with some chronic tendinosis." (*Id.*) Dr. Theut said he was "a bit at a loss here as to why she is struggling so much." (*Id.*) He suggested "some more aggressive therapy to optimize her motion, get her weightbearing and get her strength back." (*Id.*) He thought she "should be able to work in a part-time sedentary capacity" though she "claims that this is impossible due to the pain." (*Id.*) Dr. Theut concluded:

> Ultimately, we settled on keeping her off work until Monday, after which time we will keep her on part time sedentary duty for two weeks. After which time, she really has to go back to work. There is no real structural problem here that is going to be amenable to surgery and that should give her ample time to heal the sprain which is evident on the MRI.

(*Id.*)

On March 3, Yahya returned to Dr. Johnson and told him the pain was not getting any better and she would like to be referred to a specialist. (*See* Tr. 245.) Dr. Johnson's examination revealed "some swelling and pain along medial joint collateral ligament." (Tr. 246.) He gave Yahya another "To Whom It May Concern" letter stating that she "should only work part time / 4 hours for next 2 weeks" because "[s]he continues to have significant left knee pain and swelling." (Tr. 390.)

Yahya saw orthopedist Erik C. Hedlund, D.O., on March 14 "for a second opinion regarding her left knee pain." (Tr. 326.) He reviewed her MRI and diagnosed an MCL sprain, grade 1; mild quadriceps tendinosis; and mild chondrosis of the patellofemoral compartment. (*Id.*) He noted that she was "quite apprehensive and guarded during the exam," and her range of movement was limited by pain, but there was no swelling. (*Id.*) Dr. Hedlund wrote that Yahya was "quite concerned about returning to work, as she continues to have significant limitations and pain." (*Id.*) He thought anti-inflammatories "should have a significant impact on her inflammatory

pain," and suggested a knee brace, but did "not feel a corticosteroid injection [wa]s indicated." (*Id.*) He recommended "one more week off of work so she can focus on her therapy," but "otherwise, [felt] it would be appropriate to send her back to work and get her back to her daily routine." (*Id.*) When Yahya returned two weeks later on March 25, Dr. Hedlund again noted that she was "quite apprehensive, even with light touch," but he found no swelling, good stability, and intact neurovascular exam. (Tr. 325.) He wrote that they had a "lengthy discussion," during which she was again apprehensive about returning to work and was convinced that there was swelling although he found none. (*Id.*) He said, "I cannot explain why she is in so much pain and cannot see a reason why she cannot return to work." (*Id.*) He recommended another week off work so that she could focus on therapy and suggested that her employer could obtain a functional capacity evaluation. (*Id.*) Dr. Hedlund concluded: "[o]therwise, I do not see an objective reason why she cannot return and will not give her any further work releases." (*Id.*)

On April 4, 2008, Yahya saw a physician assistant in Dr. Johnson's office, who wrote that Yahya

> [n]eeds referral to help with knee pain, apparently her work is saying she is unable to do her work and and [orthopedic] docs are clearing her to work, she is asking for physiatrist referral. Her left knee continues to hurt laterally and superiorly and swell, she states it tends to give out and she needs a cane to walk. She has had MRI done by ortho, I have not seen a report. Has done PT and they have her on hold because she has not improved and appears to have received all the benefit they thin[k] she will get from PT.

(Tr. 250.) Examination of the knee revealed "tenderness to palpitation at patella, patellar tendon, lateral joint line and LCL, pain with extension and flexion," with range of movement "limited for flexion she does walk with a limp, using a cane." (Tr. 251.) The PA recommended that she "[c]ontinue ice and ROM exercises." (*Id.*)

Dr. Johnson's office referred Yahya to Benjamin J. Bruinsma, M.D., a rehabilitation and physical medicine specialist. (*See* Tr. 227.) She saw him eight times between April 2008 and March 2009. (*See* Tr. 218–29.) At his initial examination on April 29, Dr. Bruinsma noted that Yahya "ambulated with an antalgic gait, favoring her left lower extremity," had "no obvious swelling," and her "[r]ange of motion was functional with discomfort medial and lateral at end ranges." (Tr. 228.) He prescribed Relafin, which yielded significant improvement as noted a month later on May 30 (Tr. 226), but Yahya had to discontinue it because she did not have insurance (*see* Tr. 225). Dr. Bruinsma regularly noted that Yahya walked with a limp favoring her left leg, had discomfort with palpation, and positive patellar grind test, but that she had little or no swelling and her range of motion was functional. (*See* Tr. 217, 218, 219, 223, 225, 226, 228.) Dr. Bruinsma gave Yahya prescription-strength Motrin and home exercises, but felt injections were "not needed" and noted that "[s]he has seen two surgeons who did not recommend surgery." (*See* Tr. 222.) In October 2008, after he ordered bloodwork and found she had "an elevated sed rate at 43 and a positive ANA with the anti-RNP being positive,"[2] Dr. Bruinsma referred Yahya to a rheumatologist. (Tr. 221, 222.) It is not clear whether Yahya ever saw a rheumatologist; Dr. Bruinsma's records indicate there may have been issues with insurance approval. (*See* Tr. 218–19.)

In December 2008, Yahya complained to Dr. Johnson of right hip pain that had worsened since her left knee injury. (Tr. 266.) Dr. Johnson found slightly decreased range of motion on

---

[2] **Error! Main Document Only.**An erythrocyte sedimentation rate, commonly called a "sed rate," is a test that indirectly measures how much inflammation is in the body. *See* U.S. Nat'l Lib. of Med., MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/003638.htm (last updated June 1, 2011). An ANA or antinuclear antibody panel is a blood test for signs of an autoimmune disorder. *See* U.S. Nat'l Lib. of Med., MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/003535.htm (last updated Feb. 11, 2013).

examination. (*Id.*) X-rays showed mild osteoarthritic changes and a bone lesion. (Tr. 269.) At two appointments in January 2009, Yahya reported that her hip pain had significantly improved. (*See* Tr. 272, 278.) Dr. Johnson ordered a bone scan and referred Yahya to physical therapy. (Tr. 275.) The pain was worse at an appointment in February, at which Yahya appeared in a wheelchair and was "very emotional." (Tr. 284.) A straight-leg test was positive on the right. (*Id.*) Dr. Johnson increased Yahya's Vicodin prescription and ordered an MRI, which showed "some hypertrophic changes." (Tr. 285, 289.) Yahya reported feeling 70 percent better at her next appointment. (Tr. 289.)

Yahya was awarded workers' compensation in May 2009 for her knee injury. (Tr. 114.) The administrative record does not contain the findings underlying the award.

### 2. Automobile Accident

On September 25, 2010, Yahya's car was hit head-on by another car while she was stopped at a stop light. (Tr. 444.) She reported to Dr. Bruinsma on October 13, 2010, that x-rays taken at the emergency room were normal. (*Id.*) The emergency room records are not part of the administrative record, but Dr. Bruinsma later indicated that he received the results of her x-rays and they showed mild degenerative changes in the cervical spine and moderate osteoarthritis in the left shoulder, with no acute changes. (Tr. 442.) At the October appointment, Yahya was still experiencing discomfort on the left side of her neck radiating to the back, occasional numbness and tingling in the left arm, and headaches. (*Id.*) Dr. Bruinsma found limited range of motion, discomfort with palpation, and decreased sensation on examination. (*See* Tr. 445.) He diagnosed cervical whiplash with resultant myofascial pain and facet-mediated pain, and recommended she continue the Naprosyn and Flexeril she was given at the emergency room. (*Id.*) He also referred her for physical therapy. (*Id.*)

9

At examinations in November and December, Yahya had not improved despite physical therapy. (Tr. 441, 442.) Dr. Bruinsma ordered an MRI, which showed a herniated disc with compromise of a nerve root and facet changes. (Tr. 439.) Dr. Bruinsma noted that there were no neurologic findings and he did not feel surgery was needed. (Tr. 440.) Yahya declined an epidural. (*Id.*)

In January 2011, Dr. Bruinsma ordered an epidural injection due to continued complaints. (Tr. 438.) He felt she needed to continue being off work, which consisted of childcare for children ages 2, 5, 7, and 11, but he felt she did not need chore replacement services. (*Id.*) Yahya reported the next month that vacuuming aggravated her discomfort. (Tr. 437.) Her status in February was mostly unchanged, with good and bad days. (*Id.*) Dr. Bruinsma recommended she continue with Motrin and home exercise, and sent her back to physical therapy. (*Id.*) She refused injections. (*Id.*)

During examinations with Dr. Bruinsma in March, April, and May 2011, Yahya continued to have neck discomfort and decreased sensation in her left hand and forearm, but her range of motion improved slightly. (Tr. 433–36.) Yahya continued to be off work, and continued treating her symptoms with Motrin and home exercise. (*Id.*)

An electrodiagnostic test in April 2011 was normal, with no evidence of a left cervical radiculopathy, ulnar neuropathy, or carpal tunnel syndrome. (Tr. 435.)

### 3. Anxiety

Yahya experienced heart palpitations in April 2009, which improved after Dr. Johnson prescribed blood pressure medication. (Tr. 293, 300.) But in June 2009 she was back, reporting panic attacks and anxiety. (Tr. 306.) Dr. Johnson prescribed Zoloft and Ativan. (Tr. 307.) This is the only evidence of mental health treatment in the administrative record.

### 4. Reviewing Consultant Evaluations

In August 2009, William Schirado, Ph.D., reviewed Yahya's records and completed a "Psychiatric Review Technique" form for Michigan's Disability Determination Services ("DDS"). (Tr. 329–42.) DDS is a state agency that helps the Social Security Administration evaluate disability claimants. Dr. Schirado indicated that Yahya had an anxiety-related disorder. (Tr. 329.) He indicated she was moderately limited in social functioning and concentration, persistence, or pace, and mildly limited with respect to activities of daily living. (Tr. 339.)

Dr. Schirado also completed a "Mental Residual Functional Capacity Assessment" for Yahya in August 2009. (Tr. 343–45.) He indicated that she had no limitations in the area of understanding and memory; a few moderate limitations in the areas of sustained concentration and persistence, social interaction, and adaptation; and one marked limitation, in ability to interact appropriately with the general public. (*See* Tr. 343–44.) He wrote that Yahya was limited to unskilled work and no work with the public because of these issues. (Tr. 245.)

DDS consultant Dinesh Tanna, M.D., reviewed Yahya's records and completed two "Physical Residual Functional Capacity Assessments" for Yahya on October 7 and 8, 2009. (Tr. 347–62.) The two forms are mostly identical, but Dr. Tanna indicated on October 7 that Yahya could stand or walk at least 6 hours in an 8-hour workday (Tr. 348), and on October 8 that she could stand or walk at least 2 hours in an 8-hour workday (Tr. 356). He indicated on both forms that she could occasionally lift or carry up to 20 pounds and frequently lift or carry up to 10 pounds; could sit at least 6 hours in an 8-hour workday; and could never climb ladders, ropes, or scaffolds. (Tr. 348–49, 356–57.)

11

*5. Late-filed Evidence*

The administrative record includes evidence submitted to the Appeals Council after the ALJ's August 10, 2011 opinion. (*See* Tr. 447, 452.) It appears that the ALJ had only Exhibits 1F through 11F (Tr. 216–445). (*See* Tr. 36–37.) Yahya has not argued that a remand is required on the basis of evidence the ALJ did not consider, so it will not be considered here. *See Davenport v. Comm'r of Soc. Sec.*, No. 10-13842, 2012 WL 414821, at *1 n. 1 (Jan. 19, 2012) ("In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision . . . those 'AC' exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review." (citing *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir.1996))), *report and recommendation adopted by* 2012 WL 401015 (E.D. Mich. Feb. 8, 2012).

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act, disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.

> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

12

3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

ALJ Prothro first found that Yahya was insured through September 30, 2014. (Tr. 22.) The ALJ then turned to the five-step sequential evaluation of Yahya's allegation of disability. At step one, ALJ Prothro found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of January 25, 2008. (*Id.*) At step two, he found that Plaintiff had the following severe impairments: "since January 25, 2008, status-post left knee ligament sprain with tendinosis; since September 25, 2010, degenerative disc disease of the cervical spine, status-post whiplash injury secondary to motor vehicle accident; obesity; and an anxiety disorder." (*Id.*) Next, the ALJ concluded that Yahya did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (Tr. 22–23.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity

13

to perform light work as defined in 20 CFR 404.1567(b)[3] except standing and/or walking four hours, and sitting up to six hours, each per eight-hour work day, with normal breaks; no climbing of ropes, ladders or scaffolds, and no more than occasional climbing of ramps or stairs, balancing, stooping, kneeling, crouching, or crawling; performing only simple, unskilled work with no contact with the general public.

(Tr. 23–24.) At step four, the ALJ found based on vocational expert testimony that Plaintiff was unable to perform her past relevant work as a bus driver, but that considering her age, education, work experience, and residual functional capacity, there were jobs in significant numbers in the national economy that she could perform. (Tr. 28–29.) The ALJ therefore concluded that Plaintiff was not disabled as defined by the Social Security Act from the alleged onset date through the date of his decision. (Tr. 29.)

## III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the

---

[3] **Error! Main Document Only.**The RFC category of light work is defined as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b), 416.967(b). Social Security Ruling 83-10 further defines "a good deal of walking or standing" as "standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, **Error! Main Document Only.**1983 WL 31251, at *5. The ruling also adds: "The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping. Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work." *Id.*

record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512–13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

# IV. ANALYSIS

## A. Plaintiff's Credibility

Plaintiff's motion recounts her hearing testimony about her symptoms and activities and argues that the residual functional capacity formulated by the ALJ "does not adequately address her physical limitations." (Pl.'s Mot. at 9–10.) The Commissioner responds that because "Plaintiff essentially argues that she testified to work-preclusive limitations, the ALJ did not adopt those limitations, and thus the ALJ erred," without "substantively identify[ing] any errors in the ALJ's decision," the argument is so insufficiently developed that any errors should be deemed waived. (Def.'s Mot. at 12–15.)

The Court agrees that Yahya's argument is insufficiently developed. Plaintiff merely disagrees with the outcome of the ALJ's credibility determination without identifying any errors in how the ALJ made the determination. Moreover, an ALJ's credibility determination is due "great weight and deference particularly since the ALJ has the opportunity, which [a court does] not, of observing a witness's demeanor while testifying." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003); *see also Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 488 (6th Cir. 2005) ("Claimants challenging the ALJ's credibility findings face an uphill battle.").

Here, the ALJ reasoned, after a detailed review of the medical evidence, that "the above residual functional capacity assessment is supported by the medical evidence of record that documents the minimal severity of the actual impairments along with the claimant's widely variable presentation and unsupported allegations." (Tr. 28.) The ALJ also noted that Yahya "has repeatedly chosen to take her own course rather than follow medical recommendations." (*Id.*) The ALJ provided the requisite "specific reasons for the finding on credibility, supported by the evidence in the case record," that are "sufficiently specific to make clear to the individual and to

16

any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186 at *2 (July 2, 1996). Accordingly, the Court will not second-guess the ALJ's credibility determination.

### B. Expert Opinion Evidence

Plaintiff's motion mentions that "the RFC assessment must 'always consider and address medical source opinions,'" citing and quoting the relevant regulation and Social Security Ruling. (Pl.'s Mot. at 9.) The Commissioner argues that "Plaintiff's citation to boilerplate law regarding the treating source rule, unaccompanied by any allegation that the ALJ erred in assessing any treating source opinion (see Pl. Br. 8-9), is plainly inadequate." The Court agrees that Plaintiff has not adequately identified a violation of the treating-source rule. But there is an obvious omission with regard to opinion evidence in the record: there is no medical expert opinion in the record on whether Plaintiff's physical impairments (alone or combined with her mental impairments) medically equal a listed impairment.

Social Security Ruling 96-6p requires that the "judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight."[1] SSR 96-6p, 1996 WL 374180 at *3 (1996); *see also* 20 C.F.R. § 416.926(c) ("We also consider the opinion given by one or more medical or psychological consultants designated by the Commissioner."); *Retka v. Comm'r of Soc. Sec.*, 70 F.3d 1272 (6th Cir. 1995) ("Generally, the opinion of a medical expert is required before a determination of medical equivalence is made."); *Barnett v. Barnhart*, 381 F.3d 664, 667, 670 (7th

---

[1] Social Security Rulings are "binding on all components of the Social Security Administration." 20 C.F.R. § 402.35(b)(1); *Heckler v. Edwards*, 465 US 870, 873 n.3 (1984).

Cir. 2004) ("Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue."); *Fowler v. Comm'r of Soc. Sec.*, No. 12-12637, 2013 WL 5372883, at *4 (E.D. Mich. Sep. 25, 2013) (remanding because there was no expert medical opinion on the issue of equivalence, collecting cases); *Manson v. Comm'r of Soc. Sec.*, No. 12-11473, 2013 WL 3456960, at *11 (E.D. Mich. July 9, 2013) (remanding for an expert opinion at step three).

A "Disability Determination and Transmittal" form signed by a medical or psychological consultant, a "Psychiatric Review Technique" form, or "various other documents on which medical and psychological consultants may record their findings," can fulfill this requirement to "ensure that this opinion has been obtained at the first two levels of administrative review." *See* SSR 96-6p, 1996 WL 374180, at *3. Here, there is a Disability Determination and Transmittal form in the record. (Tr. 66.) But for the "Physician or Medical Specialist Signature," it refers to a Mental RFC form completed on August 17, 2009, by William Schirado, Ph.D. (*Id.*; *see* Tr. 343–46.) Dr. Schirado is a psychologist. (*See* Tr. 66; Program Operations Manual System § DI 26510.090(D), *available at* http://policy.ssa.gov/poms.nsf/lnx/0426510090 (last updated Aug. 29, 2012).) The form he completed addressed only mental functions such as memory and concentration. (See Tr. 343–44.) And Dr. Schirado specifically indicated he was not opining on Yahya's physical impairments by noting in the narrative assessment that Yahya's activities of daily living "report limitations that are more associated with and focused on physical impairments." (Tr. 345.) Likewise, the associated Psychiatric Review Technique form identifies only listings for mental impairments, and indicates that Dr. Schirado considered only Listing 12.06, for anxiety-related disorders. (Tr. 329–42.) Indeed, Dr. Schirado checked a box to indicate "Coexisting Nonmental Impairment(s) that Requires Referral to Another Medical Specialty." (Tr.

18

329.)

Dr. Schirado's opinion cannot support a conclusion that Plaintiff's physical impairments were not equivalent to any listing. *See Buxton v. Halter*, 246 F.3d 762, 775 (6th Cir. 2001) (finding that a psychologist was not qualified to diagnose a claimant's underlying physical conditions); *cf. Byerley v. Colvin*, No. 12-CV-91, 2013 WL 2145596, at *11 (N.D. Ind. May 14, 2013) ("Because the psychologist who prepared the form did not consider physical impairments, it cannot be relied on as expert opinion that Plaintiff's combination of physical and mental impairments do not equal a Listing."); *Watson v. Massanari*, No. 00-3621, 2001 WL 1160036, at *14 (E.D. Pa. Sept. 6, 2001) (remanding "so that the ALJ can enlist the services of a medical expert capable of making an equivalency finding as to Plaintiff's impairments *in combination*," where the expert opinions on equivalence in the record expressly addressed only the claimant's physical impairments).

Nor—in this case—do the Physical Residual Functional Capacity Assessments completed by Dr. Tanna suffice as an expert opinion on equivalence. (*See* Tr. 347–362.) First, the Assessments do not mention any listing or otherwise indicate that Dr. Tanna considered the issue of equivalence. *See Barnett*, 381 F.3d at 667, 671 (summarizing medical evidence including a residual functional capacity assessment by "Dr. A. Dobson" and subsequently concluding that Dr. Dobson had not "opined on the issue" of equivalence). Second, the Assessments are dated October 7 and 8, 2009—before Yahya's automobile accident in September 2010. Medical records after Yahhya's accident indicate that she had a herniated disc with compromised nerve root, accompanied by pain and loss of sensation, but Dr. Tanna could not have considered those injuries. (*See* Tr. 433–44.) His opinion therefore cannot constitute substantial evidence in the record as a whole so as to support the ALJ's finding on equivalence. Third, it is very troubling that Dr. Tanna's October 7 RFC says she could stand or walk at least six hours in an eight-hour workday

19

(Tr. 348), while the October 8 RFC says she could stand or walk at least two hours in an eight-hour workday (Tr. 356), without any change in the medical evidence cited. This unexplained discrepancy substantially undermines his opinion.

Finally, this is not a case where the Court feels comfortable analyzing equivalence in the first instance. Indeed, it may be that this Court should never do so. *Barnett*, 381 F.3d at 670 ("Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue."); *Stratton v. Astrue*, No. 11-CV-256-PB, 2012 WL 1852084, at *12 (D.N.H. May 11, 2012) ("'The basic principle behind SSR 96-6p is that while an ALJ is capable of reviewing records to determine whether a claimant's ailments meet the Listings, expert assistance is crucial to an ALJ's determination of whether a claimant's ailments are equivalent to the Listings.'" (quoting *Galloway v. Astrue*, No. H-07-01646, 2008 WL 8053508, at *5 (S.D.Tex. May 23, 2008))); *Freeman v. Astrue*, No. 10-0328, 2012 WL 384838, at *5 (E.D. Wash. Feb. 6, 2012) ("Neither the ALJ nor this court possesses the requisite medical expertise to determine if Plaintiff's impairments (including pain) in combination equal one of the Commissioner's Listings."). Even if, in some cases, the administrative record permits a lay-person to conclude that the record does not demonstrate equivalence, this is not such a case.

The administrative record, summarized in detail above, indicates that Yahya has significant physical impairments that could plausibly equal a listing. For example, one way to meet the listing for disorders of the spine is by "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. Part 404, Subpart P, Appendix 1, at § 1.04(A). Yahya's medical records include evidence

20

of a compromised nerve root (Tr. 439), decreased sensation in her left-hand fingers (Tr. 433–45), and at least one positive straight-leg test (Tr. 284). The Court has concerns that Yahya could also meet the requirements for motor loss and limitation of motion of the spine, but that is for a medical expert to determine. The Court will therefore remand this case for a medical opinion on the issue of equivalence.

The Court notes further that the overall lack of medical expert opinion evidence on Yahya's functional limitations is troubling. As discussed, Dr. Tanna's RFCs contain a significant and unexplained discrepancy, and do not address the neck injury she received in September 2010. And there are no other opinions in the regard addressing Yahya's functional limitations. The ALJ himself noted that "other than occasional and distant notes about short-periods of excuse from work, often contrary to the doctor's own beliefs, no one has opined any function-by-function limitations for the claimant." (Tr. 28.) It is not the Court's responsibility to "scour the record" for errors not raised by Plaintiff's counsel, *Martinez v. Comm'r of Soc. Sec.*, No. 09-13700, 2011 U.S. Dist. LEXIS 34436 at *7 (E.D. Mich. Mar. 2, 2011) (collecting cases), *adopted by* 2011 U.S. Dist. LEXIS 34421 (E.D. Mich. Mar. 30, 2011), but ultimately the ALJ's opinion must be supported by substantial evidence. Because there is a reversible error at step three, the Court does not address whether the rest of the decision is supported. Nonetheless, the Commissioner should ensure that the decision on remand is supported by substantial evidence in the record as a whole.

### C.  Vocational Expert Testimony

Plaintiff also challenges the vocational expert's testimony, arguing that "[t]he enumerated light jobs and the enumerated sedentary jobs . . . seem to be the same job, just different titles. Making a determination based of the availability of these jobs is erroneous." (Pl.'s Mot. at 9.) But Plaintiff did not object to the vocational expert's testimony at the hearing, and "nothing in

21

applicable Social Security regulations requires the administrative law judge to conduct his or her own investigation into the testimony of a vocational expert to determine its accuracy, especially when the claimant fails to bring any conflict to the attention of the administrative law judge." *Ledford v. Astrue*, 311 F. App'x 746, 757 (6th Cir. 2008).

Moreover, Plaintiff does not assert that the VE's testimony was inconsistent with the *Dictionary of Occupational Titles* ("*DOT*"). *DOT* job classifications often include multiple exertional categories, because the same job may be performed in different ways. *See DOT* (4th Ed., Rev. 1991), App. D, *available at* http://www.oalj.dol.gov/public/dot/references/dotappd.htm ("Occupational definitions in the DOT are written to reflect the most typical characteristics of a job as it occurs in the American economy. Task element statements in the definitions may not always coincide with the way work is performed in particular establishments or localities.")

The VE testified that his testimony was consistent with the *DOT*, as required by Social Security Ruling 00-4p, 2000 WL 1898704 (Dec. 4, 2000). (Tr. 62.) And although the job classifications in the *DOT* include multiple exertional categories, the VE's testimony was specifically tailored to the exertional requirements of each hypothetical question. (*See* Tr. 60–61.) *Cf. Ledford*, 311 F. App'x at 757 ("[A]lthough the vocational expert testified that the Dictionary of Occupational Titles classifies dishwashing jobs at both the light- and medium-exertion levels, the administrative law judge requested that the expert limit the number of available jobs in that occupational listing to those that would not be affected by the 30–pound limitation on the weight that Ledford could lift."). Plaintiff's argument that the ALJ erred by relying on this testimony is incorrect.

**V. CONCLUSION**

For the reasons set forth above, the Court finds that the ALJ erred by failing to obtain a medical expert opinion on medical equivalence. The Court therefore GRANTS IN PART Yahya's Motion for Summary Judgment (Dkt. 8), DENIES the Commissioner's Motion for Summary Judgment (Dkt. 10), and, pursuant to 42 U.S.C. § 405(g), REMANDS for the Commissioner to obtain a medical expert opinion on medical equivalence.


Date:   May 5, 2014                               s/Laurie J. Michelson
                                                  Laurie J. Michelson
                                                  United States District Judge


                        CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on May 5, 2014.

                                    s/Jane Johnson
                                    Deputy Clerk